**George Leighton DAHL, Appellant,**

v.

**Gloria Dahl AKIN and Ted M. Akin, Appellees.**

**Gloria Dahl AKIN, et al., Appellants,**

v.

**George Leighton DAHL, Appellee.**

**Nos. 9339 to 9341.**

Court of Appeals of Texas, Amarillo.

Oct. 29, 1982.

Rehearing Denied Dec. 22, 1982.

Bickel & Case, Thomas L. Case, Louis P. Bickel, William M. Mount, Dallas, for George Leighton Dahl, appellee-appellant.

Law, Snakard & Gambill, Robert M. Randolph, Fort Worth, guardian ad litem for Adrienne Akin and Ashley Akin.

McDaniel & Travis, Samuel D. McDaniel, Austin, for Gloria Dahl Akin and Ted M. Akin, appellants-appellees.

Before REYNOLDS, C.J., and DODSON and COUNTISS, JJ.

REYNOLDS, Chief Justice.

The litigants have perfected three separate appeals from individual judgments rendered in three suits filed in different district courts of Dallas County and consolidated for trial before a jury. The appeals, involving a number of interrelated subject matters, were submitted together, and this opinion sets forth the rationale upon which we have rendered a judgment in each cause.

Preliminary summaries of the background, factual setting, and litigation are appropriate to position the appeals. The details adscititious to the summaries and pertinent to each cause are included in the discussion of the appeal of that cause.

### Background

Gloria Dahl Akin is the only child of George Leighton Dahl and his deceased wife, Lille E. Dahl. Mrs. Akin and her

husband, Justice Ted M. Akin, are the parents of four children, two of whom were minors when these causes were tried.

By her will, Mrs. Dahl, who died in 1957, created a testamentary trust—the Lille E. Dahl Trust. Vesting the residue of her estate in Mr. Dahl, who was appointed trustee, and his successors, in trust, Mrs. Dahl specified that

> (b) If at any time during the life of my husband, GEORGE L. DAHL, his income from all other sources is insufficient to support and maintain him in the station of life to which he is accustomed, having in mind his income from all other sources, there shall be paid to my husband out of the net income and/or corpus of the Trust such amounts as are necessary to make up such deficiency, it being specifically understood, however, that my husband, GEORGE L. DAHL, shall in no manner participate in any decisions with reference to payments to himself out of the income and/or corpus of the Trust, but such decisions shall be made by my said daughter [Gloria Lille Dahl Akin], if living . . .

Subject to this provision, Mrs. Dahl then provided that

> the remaining net income of the Trust, in the discretion of the Trustee, may be paid to my daughter, GLORIA LILLE DAHL AKIN, and to any of my grandchildren in such amounts as the Trustee shall determine.

Any income not distributed to the beneficiaries is, by the terms of the trust, to be accumulated and become a part of the corpus of the trust.

Mrs. Dahl next granted two special powers of appointment with respect to the trust properties. Mr. Dahl was empowered to appoint, by his deed or other written instrument during his life or by his last will and testament, the trust properties or part thereof to and among Mrs. Akin, her husband, and her children and descendants, and the spouses of her children and descendants, in such proportion and upon such terms and conditions and upon such trusts as he shall determine. Subject to that special power of appointment, Mrs. Akin was granted the power to appoint the trust properties, by her will at her death, to and among her husband, and her children and descendants, and the spouses of her children and descendants, upon such terms and conditions and subject to such trusts as she may see fit.

Subject to the two special powers of appointment, the trust was to continue until its termination at the death of Mr. Dahl and Mrs. Akin. By the trust's termination at that time, the assets vest in Mrs. Akins' children, except for twenty percent of the assets which will vest in Justice Akin upon certain contingencies.

Mrs. Dahl declared that the trustee shall have a reasonable compensation, but not to exceed the fees charged by trust departments of banks in Dallas. She provided broad powers in the trustee over the trust properties, specifying that no trustee shall be liable for any mistake or error in judgment, but shall be liable only in case of bad faith or dishonesty.

The First National Bank in Dallas and Mrs. Akin are appointed successor co-trustees to Mr. Dahl. Mrs. Akin may remove the bank as co-trustee, but, in that event, she shall appoint as successor trustee a national bank having trust powers.

## Factual Setting

When the trust came into being in 1961, its assets were approximately one-half million dollars. During Mr. Dahl's tenure as trustee, he distributed to the Akins and their children trust funds amounting to more than $600,000, excluding distributions made and returned in the form of loans for the trust or to Mr. Dahl. At the time of the trial in 1980, the corpus of the trust was valued in excess of two million dollars.

Beginning in 1966, Mr. Dahl borrowed from Mrs. Akin various sums of money which had been distributed to her by the trust and evidenced by his indebtednesses by notes. In 1969, Mr. Dahl and the Akins executed an instrument "constitut[ing] a mutual understanding and agreement" con-

cerning recited money matters, which expresses that "the general principle or method of settlement agreed upon" includes a proviso that

Any balance of personal notes from George L. Dahl to Ted & Gloria Akin ... would continue to be held by Gloria Akin as claims to be collected from the estate of George L. Dahl upon his demise. The personal notes of George L. Dahl are to be renewed annually, but shall not carry any interest ....

At the time of trial, the personal notes from Mr. Dahl were in the principal amounts of $274,702.26 to Mrs. Akin, $38,500 to Mrs. Akin as trustee for George D. Akin, and $38,500 to Mrs. Akin as trustee for Laurel S. Akin.

In 1970, the Akins guaranteed $160,000 of Teletronics Industries, Inc.'s $180,000 note held by First National Bank in Dallas. In 1971, Justice Akin executed a security agreement and delivered a certificate for 12,000 shares of Hargrove Electric Company, Inc. stock to the bank, together with a stock power form executed in blank, in connection with his securing the payment of an indebtedness unrelated to the Teletronics note. The indebtedness was paid, but the stock certificate was not retrieved.

When Teletronics defaulted on its note in 1972, the bank filed suit against the Akins. The trust then paid $107,781 to the bank to pay the balance due on the Teletronics note on behalf of the Akins. The bank assigned the Teletronics note and security agreement, together with the Akins' guaranty, to the trust. At the same time, the bank delivered to the trust the security agreement executed by Justice Akin in 1971, the Hargrove stock certificate, and the executed stock power form in blank.

The $107,781 paid by the trust was not handled as a distribution of trust funds. Later it was written off as an uncollectible account, the trust taking a tax credit.

In 1975, the trust delivered three checks totaling $318,600 to the Akins, who used the money to pay off another guaranteed Teletronics note and other debts. The delivery was not handled as a distribution of trust funds because there would have been a substantial income tax liability to the Akins. Instead, there was completed a transaction—a "tax gimmick," in the words of Mr. Dahl's comptroller—whereby the Akins sold and conveyed a number of rental properties they owned, collectively referred to as the McKinney Street property, to the trust for $318,600, which generated a lesser capital gains tax to the Akins.

Afterwards, it was discovered that title to one of the tracts, more accurately described as the Richland Hills property, was in Hargrove Electric Company, Inc. On 28 May 1975, Mr. Dahl, as trustee of the trust, and Justice Akin executed a memorandum agreement, which recited that since Justice Akin, who owned fifty percent of the authorized and issued stock of the Hargrove corporation, had theretofore pledged all of his Hargrove stock to the trust as collateral to secure any and all indebtedness he may owe the trust, the trust would convey the property to Justice Akin as trustee with authority to convey the property to the Hargrove corporation, and that the relationship between the corporation, Justice Akin, and the trust with respect to the pledged stock would be computed and finalized by 1 July 1975.

Subsequently, the trust sold the McKinney Street property tracts, except for three of the tracts. The comptroller, giving the details of the transactions, testified that the trust "about broke even on the thing."

### Litigation

Differences arose between Mr. Dahl and the Akins. Initially, the focus was on the Akins' objection to Mr. Dahl's proposed remarriage and his reaction, together with his criticism of the Akins' spending habits. In a 24 April 1978 letter to the Akins, Mr. Dahl set forth his view of the differences and announced his severance of all relationships with the Akins.

In the interim on 28 March 1978, Mrs. Akin had filed an application for the immediate appointment of a temporary guardian for the person and estate of Mr. Dahl, who

was unaware of the action. The matter was not pressed until April 20, at which time Mrs. Akin was appointed temporary guardian by a court order fixing her bond at one million dollars. She filed the bond and took the oath of office on April 21, but the instruments were not filed until the 26th of April.

Meanwhile on April 25, Mrs. Akin signed and filed an application alleging that Mr. Dahl was mentally ill and required observation and/or treatment in a mental hospital. As a result, Mr. Dahl was arrested on the court's warrant on April 26, and he was confined in a hospital for some two weeks. At a hearing on May 16, the judge dismissed the mental illness proceedings. No appeal was taken from the May 17 judgment of dismissal.

Thereafter on 22 May 1978, Mrs. Akin amended her guardianship application to allege the need to appoint a permanent guardian of both the person and estate of Mr. Dahl upon the ground that he "is not mentally competent or physically able to attend to his personal affairs or business affairs." Upon a jury verdict that Mr. Dahl "is not of unsound mind," the court rendered judgment denying Mrs. Akin's application for permanent guardianship. On appeal, the judgment was reformed to comport with the jury's verdict and, as reformed, was affirmed. *In re Guardianship of Dahl*, 590 S.W.2d 191 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.).

The litigation spawned the three lawsuits underlying the appeals now before us. The suits are noted in the order of filing.

First, Mr. Dahl brought an action, No. 78–11230–L on the docket of the 193rd Judicial District Court, against the Akins. By this action, Mr. Dahl sought to hold the Akins liable in damages for, among other torts, malicious prosecution.

Then, Mrs. Akin, individually and as trustee for two of the Akins' children, George D. Akin and Laurel S. Akin, each of whom individually joined in the suit, filed an action, No. 78–12590–H, on the docket of the 160th Judicial District Court, against Mr. Dahl. The object of the suit was for recovery upon three notes executed by Mr. Dahl and to recover stock of the Hargrove Electric Company, Inc. held by him as trustee for the trust.

Next, Mrs. Akin filed an action, No. 79,-904–A on the docket of the 14th Judicial District Court, against Mr. Dahl. By this suit, Mrs. Akin sought the removal of Mr. Dahl as trustee of the trust and to avoid his special power of appointment.

The suits were consolidated for trial. After hearing the evidence recorded in 2,000 pages of the statement of facts and on 56 exhibits, the jury returned its verdict on the special issues submitted for each suit in one charge.

In suit No. 78–11230–L, which the litigants refer to as the malicious prosecution suit, a monetary judgment was rendered on the jury's verdict in favor of Mr. Dahl. The Akins have appealed from the judgment in our Cause No. 9341.

In suit No. 78–12590–H, which the litigants refer to as the note suit, a judgment, rendered on the jury's verdict and the court's findings, was generally in favor of Mrs. Akin and others. Both Mr. Dahl and Mrs. Akin have appealed from the judgment in our Cause No. 9340.

In suit No. 79,904–A, which the litigants refer to as the trust suit, a judgment, rendered on the jury's verdict and the court's finding, was adverse to Mr. Dahl. He has appealed from the judgment in our Cause No. 9339.

### No. 9341—Malicious Prosecution Suit

In his live trial pleadings filed in Cause No. 78–11230–L in the 193rd Judicial District Court, Mr. Dahl sought to hold the Akins monetarily liable individually and as co-conspirators on several causes of action. The causes of action asserted were libel, slander and defamation, false or wrongful arrest, false or wrongful imprisonment, abuse of process, and malicious prosecution. He claimed both actual and exemplary damages. Actual damages asserted were: $4,000,000 for mental and physical pain and suffering, embarrassment, humiliation,

damage to his name, reputation, and credit, and loss of ability to pursue his profession; $2,255 for medical expenses; and $250,000 for attorney's fees. Exemplary damages of $7,500,000 were asserted for the willful and malicious conduct of the Akins. The Akins joined the issues by their general denial.

The evidence adduced about this unfortunate family dispute will be detailed only as necessarily appropriate to and in connection with the appellate issues. At this point, a summary suffices.

To support his pleaded operative facts, Mr. Dahl produced evidence designed to persuade the jury that: he and the Akins had numerous and heated disagreements over his interest in remarriage, particularly his proposed marriage to the lady he later married, and about their spending habits; the possibility of a subject of his bounty other than themselves and their desire to take control of his and the trust's property, rather than their concern over his mental condition, prompted the Akins to initiate, without any notice to him, temporary guardianship and mental illness proceedings; based upon the Akins untrue allegations of mental incapacity and Mrs. Akin's application founded on legal conclusions, he was arrested and confined incommunicado in a hospital where he was subjected to humiliation and invasions of his body; on the day following his hospitalization, he was served with notice of Mrs. Akin's appointment a month previously as temporary guardian of both his person and his property; the proceedings were initiated by the Akins on half truths and outright fabrications when in fact there was neither need for his hospitalization nor the existence of facts and circumstances suggesting he was mentally incompetent or of unsound mind; the family doctor who relied on what the Akins told him in stating that competency proceedings were appropriate, had not seen Mr. Dahl in more than two years; Mr. Dahl's friends and associates, who were in frequent contact with him, were of the opinion that he was intelligent and competent; the Akins took charge of his and the trust's properties, removing his private papers and securities which had not been re-turned, and disturbed his office for an audit which found nothing amiss; and that, as a result, he suffered personally and professionally, and the damage to his reputation as a world renowned architect and astute businessman established during his 86 years was irreparable.

The evidence disclosed that upon a hearing, the mental illness proceeding was dismissed without an appeal therefrom. Upon trial, the temporary guardianship was terminated and Mrs. Akin's application for permanent guardianship was denied upon the jury's verdict that Mr. Dahl is not of unsound mind. 590 S.W.2d at 194.

In turn, the Akins produced evidence designed to persuade the jury that: Mr. Dahl's physical and mental conditions had changed in detailed particulars and to the extent that they had a sincere concern for his welfare, thinking he was mentally ill and incompetent; although Mr. Dahl's proposed marriage, about which he and Mrs. Akin had extensive disagreements, was what prompted her to initiate the guardianship and mental illness proceedings, her actions were taken because she considered his relationship with his future wife evidence of the changes taking place in her father, and it was time to do something; the family doctor considered the competency proceedings were appropriate; and three psychiatrists, after examining Mr. Dahl upon his hospitalization, concluded that he did suffer from a mental illness, regardless of anything the Akins told them. The evidence disclosed that the hospitalization of Mr. Dahl and the Akins' exercise of control over his and the trust's properties were pursuant to court orders.

Hearing the evidence, which the Akins submit is fairly summarized in our former opinion appearing in 590 S.W.2d at 198, the jury made its findings. The findings, numbered to correspond to the special issue submission, are that: (1) Mrs. Akin did not have probable cause to prosecute the guardianship proceeding, which (2) she did with malice, and (3) the Akins acted in a conspiracy with one another in planning, institut-

ing, and maintaining the guardianship proceeding, (4) Mrs. Akin brought the mental illness proceeding without probable cause, (5) she acted with malice in causing the mental illness application to be filed, and (6) the Akins acted in a conspiracy with one another in planning, instituting, and maintaining the mental illness proceeding.

The jury fixed Mr. Dahl's actual damages at (7) $1,130,000 resulting from the guardianship proceeding,[1] and (9) $1,010,000 resulting from the mental illness proceeding.[2] The jury's award of exemplary damages on account of the prosecutions was (8) none for the guardianship proceeding, and (10) $500,000 for the mental illness proceeding.

The court rendered judgment on the jury's verdict, decreeing that Mr. Dahl recover from the Akins, jointly and severally, the amount of $2,640,000 awarded by the jury. Later, upon the court's suggestion of remittitur totalling $1,450,000[3] as a condition of not granting a new trial, and Mr. Dahl's remittance of that amount, the court confirmed the judgment balance to be the sum of $1,190,000.

Appealing from the judgment, the Akins have drafted ten points of error which, albeit manifold, present complaints that have been preserved for appellate review. Mr. Dahl has a cross-point by which he complains that the court erred in ordering the remittitur.

Initially, the Akins challenge the legal and factual sufficiency of the evidence to support the jury's finding that Mrs. Akin had acted without probable cause in bringing the guardianship and the mental illness proceedings, contending that probable cause was established by the evidence.[4] The

1. Special issue number 7 and the jury's answers are as follows:

 Find from a preponderance of the evidence that amount of money, if any, that would fairly and reasonably compensate George Leighton Dahl for the injury he received as a proximate result of the guardianship proceeding. In arriving at such amount of money, if any, you will take into consideration the following elements, and none other, to-wit:

 (1) Damage, if any, to his professional and personal reputation. $500,000.00

 (2) Compensation, if any, for the emotional distress, including mental pain, suffering and humiliation, resulting from the institution and prosecution of the guardianship proceeding against him. $500,000.00

 (3) Expenses, if any, including attorney's fees, reasonably and necessarily incurred by George Leighton Dahl in defending himself against the guardianship proceeding and the appeals therefrom. $130,000.00

 (4) Loss of earning capacity, if any. $ None

2. Special issue number 9 and the jury's answers are as follows:

 Find from a preponderance of the evidence that amount of money, if any, that would fairly and reasonably compensate George Leighton Dahl for the injury, if any, he received as a proximate result of the mental illness proceeding. In arriving at such amount of money, if any, you will take into consideration the following elements, and none other, to wit:

 (1) Damage, if any, to his professional and personal reputation. $500,000.00

 (2) Compensation, if any, for distress, if any, including physical and mental pain, if any, suffering and humiliation, if any, resulting from the institution and prosecution of the mental illness proceeding and his arrest and incarceration from April 26, 1978 until May 12, 1978 in connection therewith, if any. $500,000.00

 (3) Expenses, if any, including attorney's fees, reasonably and necessarily incurred by George Leighton Dahl in defending himself in the mental illness proceeding. $ 10,000.00

 (4) Loss of earning capacity, if any. $ None

3. The court suggested a remittitur of $400,000 of each of the $500,000 awards of actual damages by the jury's answers to special issues nos. 7(1), 7(2), and 9(1), which are recorded in marginal notes 1 and 2, and a remittitur of $250,000 of the $500,000 award of exemplary damages.

4. It was Mr. Dahl's burden to persuade the jury to find, as he did, that Mrs. Akin did not have probable cause to prosecute the guardianship proceeding, and that she brought the mental illness proceeding without probable cause. In deciding the contention that the evidence is legally insufficient to support the jury's findings, we will, as we must, consider only the evidence and inferences tending to support the findings and disregard all evidence and inferences to the contrary. In deciding the contention that the evidence is factually insufficient to support the jury's findings, we will, again as we must, consider all of the evidence to determine whether the evidence supporting the findings is so weak or the evidence to the contrary is so overwhelming that the findings, or either of them, should be set aside. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). The affirmative findings of want of probable cause are not

question here, they offer, is whether medical opinion and facts which might have supported a jury verdict that Mr. Dahl lacked competency are sufficient to establish probable cause for Mrs. Akin's having brought the proceedings.

However, the controlling question, and the one submitted to the jury, is not so narrow. The court gave the traditional meaning of probable cause, albeit tailored to each proceeding,[5] and the Akins made no objection to the instructions.[6] Thus, the determination to be made is whether the required evidential support exists for the findings made by the jury to the probable cause issues submitted to it.

It does not profit to extract and dissect further details from the evidence. Suffice it to state that, given the evidence of medical opinion and testimonial facts bearing on incompetency adduced and referred to by the Akins, the jury was not bound to credit it with more weight than the produced evidence of competency. *Compare Coxson v. Atlanta Life Ins. Co.,* 142 Tex. 544, 179 S.W.2d 943, 945 (1944).

The competency evidence was directed toward showing that at the pertinent times, Mr. Dahl's mental health was not, and there was no reasonable basis in the known facts for a belief that it was, substantially impaired, and that he was mentally competent to manage his person and business affairs. *See, e.g., Pendleton v. Burkhalter,* 432 S.W.2d 724, 731 (Tex.Civ.App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.). Of importance for the jury's consideration was the evidence bearing on the question whether Mrs. Akin did or did not in good faith make a full and fair disclosure of all of the facts and circumstances known to her in bringing the guardianship and mental illness proceedings. *See, e.g., Eans v. Grocer Supply Co., Inc.,* 580 S.W.2d 17, 21 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ).

■ Consequently, there being some evidence of want of probable cause, whether facts existed establishing the lack of probable cause was for the jury's determination under appropriate instructions as to what

---

subject to the Akins' contention that probable cause was established by the evidence. A contention that the evidence conclusively establishes the opposite of the vital fact is proper only where the jury finds the non-existence, or fails to find the existence, of the fact vital to a claim or to a defense. *See* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 361, 362–64 (1960).

5. In connection with special issue number 1, the court instructed that

[T]he term "probable cause" means the existence of such facts and circumstances that would excite the belief in a reasonable mind, acting on the facts within his or her knowledge that at the time in question George Leighton Dahl was a person of unsound mind or a person mentally incompetent to care for himself or to manage his property and financial affairs and required the immediate appointment of a guardian. Further, you are instructed that a person filing a temporary guardianship application may also rely upon information derived from others if such information comes from those who have an opportunity to know, and comes from a credible source, and is accepted by the applicant in good faith, and he or she believes such information to be true, acting as a reasonably prudent person would act under the facts and circumstances. You are further instructed that the verdict returned by the jury in the

guardianship case is not to be considered by you for any purpose.
And, in connection with special issue number 4, that
[T]he term "probable cause" means the existence of such facts and circumstances that would excite the belief in a reasonable mind, acting on the facts within his or her knowledge that at the time of the institution of the mental illness proceeding that George Leighton Dahl's mental health was substantially impaired and because of this he was likely to injure himself or others if not immediately restrained. Further, you are instructed that a person filing a mental illness application may also rely upon information derived from others if such information comes from those who have an opportunity to know, and comes from a credible source, and is accepted by the applicant in good faith, and he or she believes such information to be true, acting as a reasonably prudent person would act under the facts and circumstances. You are further instructed that you are not to consider for any purpose that the mental illness proceeding was dismissed.

6. It was Mr. Dahl who objected to the instructions, submitting that they permitted consideration of hearsay and excluded consideration of the disposition of the prior proceedings.

facts constitute probable cause. 1 R. Ray, Texas Law of Evidence § 7 (Texas Practice 3d ed. 1980). The jury's findings established want of probable cause and, after considering the evidence under the standards of review applicable to each appropriate challenge to the findings, we cannot say the jury's findings are faulty.

 The want of probable cause findings are not vulnerable to the Akins' further contention that probable cause should be held to exist in this cause because "the temporary guardianship and mental illness committment [*sic*] were brought upon orders issued by the courts of this state after a judge had heard the evidence sufficient to authorize these preliminary actions." Notwithstanding the court orders, no one has the right or authority, under the law, to start a malicious prosecution; and, when one maliciously sets in motion the machinery of the law in a wrongful prosecution resulting in damage, an action for malicious prosecution will lie. Therefore, in a malicious prosecution action, it is no defense to say that the prosecution was in the course of a judicial proceeding before a court of competent jurisdiction. *Suhre v. Kott,* 193 S.W. 417, 419 (Tex.Civ.App.—San Antonio 1917, no writ). The first point of error is overruled.

 Neither can we, as the Akins urge we should, fault the evidence as being legally or factually insufficient to support the jury's findings that Mrs. Akin acted with malice. It has been a long established principle that the jury may infer malice from the proof of want of probable cause, even though the jury should not be, and it was not in this cause, so instructed. *Biering v. First Nat. Bank,* 69 Tex. 599, 7 S.W. 90, 92 (1888).

Moreover, although there is no direct record evidence of malice per se, there is record evidence of circumstances bearing on malice. The jury heard the details of the Akins' objections to Mr. Dahl's consideration of remarriage and of his complaints concerning their financial irresponsibility; the evidence touching on whether the representations made by the Akins for the initiation of the guardianship and mental illness proceedings were full and truthful; the character of the actions taken by the Akins leading to and during the proceedings, and the likely motivations therefor; the nature of the allegations upon which the Akins based the two proceedings and the explanations that the allegations, if true, were attributable to circumstances other than mental incapacity; and the degree to which the initiation of those proceedings curtailed Mr. Dahl's personal liberty and interfered with the exercise of his property rights until the proceedings were terminated favorable to Mr. Dahl. The circumstances, measured by the court's instruction that malice "means ill will or evil motive or such gross indifference or reckless disregard for the rights of others as to amount to wanton and willful action, knowingly and unreasonably done," are sufficient for the jury to infer malice. *J.C. Penney v. Gilford,* 422 S.W.2d 25, 28 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). The second point is overruled.

By the third point, the Akins charge the court with double error in rendering a personal and individual judgment against Justice Akin. First, they contend that the evidence is legally and factually insufficient to support the jury's findings that the Akins acted in a conspiracy with one another in planning, instituting and maintaining, respectively, the guardianship proceeding and the mental illness proceeding. Second, they contend that without a finding that Justice Akin acted with malice, the conspiracy findings are inadequate to establish a cause of action against him.

In support of the evidential insufficiency contention, the Akins tender this evidence: Justice Akin contacted some people to inquire about their thoughts concerning Mr. Dahl's mental capacity; he was instrumental in recommending and obtaining a lawyer for Mrs. Akin; and he supported her in her efforts, concurring with her in her observations regarding her father's condition and judgment. It is then argued that this evidence shows only what a normal husband would have done; therefore, they conclude,

the evidence falls far short of evincing a conspiracy the court defined to be "a combination of two or more persons who, acting in concert, accomplish an unlawful purpose or accomplish a purpose not itself unlawful but do so by unlawful means."

Yet, the foregoing is not the only evidence of Justice Akins' activities presented for the jury's consideration. The jury heard that he independently decided that Mr. Dahl was incompetent and communicated that decision to Mrs. Akin. He not only recommended and obtained a lawyer for Mrs. Akin, but he met with the lawyer, either alone or with Mrs. Akin, on almost a daily basis for a period of more than two months extending from before the initiation of the temporary guardianship proceeding until after the mental illness proceeding was dismissed. He made two telephone calls to Mr. Dahl's attorney in relation to a premarital agreement between Mr. Dahl and the lady Mr. Dahl later married. Justice Akin made, or had someone in his office make, daily inquiries to the county clerk's office to ascertain if Mr. Dahl had obtained a marriage license. The items that he and Mrs. Akin took from Mr. Dahl's office and apartment during Mr. Dahl's hospitalization were selected by Justice Akin for the purpose of trial preparation.

Furthermore, Justice Akin, prior to the initiation of the mental illness proceeding, had a meeting with Judge Ashmore, a probate judge. The justice told Judge Ashmore that Mr. Dahl had been doing some strange things, but more than that, Mr. Dahl was supposed to be taking medication, and if he did not get it, he stood a likely chance of having a heart attack.[7] Justice Akin added that Mr. Dahl had taken up with some lady (the lady Mr. Dahl subsequently married), who was exercising undue influence on him by encouraging him not to take any medication. Judge Ashmore recalled that Justice Akin said she had gotten Mr. Dahl to quit taking the medication without which, the doctors told the Akins, his life was in danger.

That information, Judge Ashmore said, was the basis for his signing the warrant to arrest and hospitalize Mr. Dahl upon Mrs. Akin's application, the judge stating "that if I didn't get him in the hospital . . . the man was going to die if he didn't get medication." In the judge's opinion, no other allegation in the application for hospitalization would be grounds for him to sign a warrant and, if the allegations were not true, there would have been nothing before him.

Judge Ashmore testified that when he later asked about Mr. Dahl, Justice Akin said he was in the hospital taking medication. Thereafter, in a hearing before Judge Ashmore, a doctor testified that Mr. Dahl had received no medication. The testimony that Mr. Dahl was no longer receiving medication or never received medication[8] was one of the things on which Judge Ashmore based his decision to dismiss the mental illness proceeding.[9]

These evidential excerpts are, if credited by the jury, evidence that together, the Akins had a meeting of their minds on planning, instituting, and maintaining the guardianship and mental illness proceedings. The evidence, together with the evidence sustaining the findings of Mrs. Akin's want of probable cause and her malice, constitute some evidence of probative force to support the jury's findings of conspiracy. The force of the evidence is not blunted by the absence of an open declaration of the conspiracy, for a conspiracy may be, and usually must be, proved circumstantially.

---

7. In the present action, Mrs. Akin testified that a doctor had prescribed pills for her father, but that she "didn't know what the pills did."

8. Testifying in the present action, Mr. Dahl said a doctor gave him a pill several years ago and recommended that he take that as long as he lived, but "I haven't taken that pill for three or four years and I'm still living."

9. The decision to dismiss was confirmed when Judge Ashmore talked with Mr. Dahl in chambers and the judge found Mr. Dahl to be dapper looking with a sharp memory, particularly as to recall, and in good shape for an eighty year old man.

*Schlumberger Well Sur. Corp. v. Nortex Oil & G. Corp.,* 435 S.W.2d 854, 858 (Tex.1968). After considering all of the evidence before the jury, we cannot say that the evidence is so weak or the evidence to the contrary is so overwhelming that the conspiracy findings, or either of them, should be set aside.

■ Neither are we in accord with the Akins' bare statement under the point that without a finding that Justice Akin acted with malice, the conspiracy findings are inadequate to establish a cause of action against him. The gist of a cause of action for civil conspiracy is the damage from the commission of a wrong which injures another, and not the conspiracy itself. *Id.* at 856; *Estate of Stonecipher v. Estate of Butts,* 591 S.W.2d 806, 808 (Tex.1979). Where a plaintiff has a cause of action against one of the conspirators individually, such as Mr. Dahl proved against Mrs. Akin, he may then maintain an action for the conspiracy, *Delz v. Winfree,* 80 Tex. 400, 16 S.W. 111, 112 (1891), the liability for which is joint. *Nortex Oil & Gas Corporation v. Clark,* 369 S.W.2d 671, 674 (Tex.Civ.App.—Dallas 1963, no writ). The third point is overruled.

Next, the Akins urge as error that special issues nos. 7(1)(2) and 9(1)(2), reproduced in marginal notes 1 and 2, allow the double recovery of damages for identical elements of damages occurring over a concurrent period of time. Reliance is had upon *Huggins v. Carey,* 108 Tex. 358, 194 S.W. 133 (1917), and *Grissom v. Lopez,* 280 S.W. 613 (Tex. Civ.App.—San Antonio 1926, writ dism'd). The cases are inapposite.

In *Huggins,* the court's charge erroneously authorized the jury to assess damages twice for the same elements involved in a single cause of action for breach of a marriage contract. 194 S.W. at 134–35. In *Grissom,* the court's charge erroneously divided the damages for one malicious prosecution into two causes of action, causing the jury to believe that every phase of the case demanded separate damages. 280 S.W. at 614. Neither of those situations is presented by the record before us.

■ Although mental and physical incapacity and mental illness may coexist, there is an important distinction between them, *In re Guardianship of Berry,* 515 S.W.2d 12, 13 (Tex.Civ.App.—Dallas 1974, no writ), and, in the cause at bar, different objects were sought to be achieved by allegations of the existence of each. By the guardianship proceeding, the control of Mr. Dahl's person and property, as well as the property of the trust for which he was trustee, was sought; by the mental illness proceeding, the hospitalization of Mr. Dahl was sought. Mr. Dahl sued for damages for the malicious prosecution of each proceeding. The jury made findings, which we have sustained against the attacks made on them, that established a malicious prosecution of each proceeding.

It is axiomatic that one who is maliciously prosecuted is entitled to damages occasioned by the prosecution. *McManus v. Wallis,* 52 Tex. 534, 546 (1880). In submitting the questions of damages to the jury, the court was careful to instruct the jury on the compensible elements that could be considered in arriving at damages, if any, attributable to each proceeding. Although the elements of damages for each are similar, the propriety of the elements is not challenged. The jury's verdict manifests a segregation of the damages it found to result from the guardianship proceeding from the damages it found to flow from the mental illness proceeding. Thus, rather than allowing a double recovery, the court's submission only authorized compensation for the elements of the particular injury. An injured party is entitled to that recovery. *Davis v. Teague,* 256 S.W. 957, 961 (Tex.Civ.App.—Beaumont 1923, writ dism'd). The fourth point is overruled.

For avoidance of the award of exemplary damages, the Akins cite the principle that where the authorities, after an honest and full disclosure, initiate a prosecution, no action of malicious prosecution will lie against the discloser. *Sebastian v. Cheney,* 86 Tex. 497, 25 S.W. 691, 692 (1894). We, of course, accept the principle, but not, contrary to the Akins' fifth contention, its application to the mental illness proceeding part of this

cause to avoid the award of exemplary damages made in answer to special issue no. 10.

■ The jury made findings, which we have upheld, that implicitly negate an honest and full disclosure of the facts and circumstances known when the guardianship and mental illness proceedings were brought. The jury's findings establish that the mental illness proceeding was a malicious prosecution. It long has been the rule in Texas that a suit for malicious prosecution admits the recovery of exemplary damages in the nature of a penalty. *McManus v. Wallis, supra,* at 547. *Accord, Jameson v. Zuehlke,* 218 S.W.2d 326 (Tex.Civ.App.—Waco 1948, writ ref'd n.r.e.). The fifth point is overruled.

■ It was evidenced that Mrs. Akin filed the guardianship proceeding on 28 March 1978 and filed her bond and took the oath of office on the 26th of April. An unsuccessful objection was made to special issue no. 1 on the ground that it does not designate April 26 as the date for determination of the probable cause issue. The Akins now contend, by their points six [10] and seven, but without citation of supporting authority, that the submission was erroneous. They argue that there is no cause of action for malicious prosecution arising from the mere filing of a guardianship proceeding; instead, they state, that for there to be a cause of action, there must be some action by which the ward is deprived of property or liberty which, in this instance, was on 26 April 1978, when Mrs. Akin qualified as guardian. We disagree.

Presumably, the argument is referenced to the principle that in Texas, damages for

prosecution of civil suits with malice and without probable cause cannot be recovered unless the person sued suffers some interference, by reason of the suit, with his person or property. *Pye v. Cardwell,* 110 Tex. 572, 222 S.W. 153 (1920); *Louis v. Blalock,* 543 S.W.2d 715, 719 (Tex.Civ.App. —Amarillo 1976, writ ref'd n.r.e.). But the principle is not associated with the inquiry posed by special issue no. 1. Rather, the inquiry was whether Mrs. Akin "did not have probable cause to prosecute the guardianship proceeding?" The issue, and its accompanying instruction as quoted in marginal note 5, both comport with accepted authority that the accountability for malicious prosecution commences when the prosecution is instigated, *Gulf, C. & S.F. Ry. Co. v. James,* 73 Tex. 12, 10 S.W. 744, 748 (1889), or the suit is instituted, *Suhre v. Kott, supra,* at 418, which generally is when the charging instrument is filed, *Shannon v. Jones,* 76 Tex. 141, 13 S.W. 477, 479 (1890), purposely setting in operation the machinery of law. *Daughtry v. Blanket State Bank,* 41 S.W.2d 527, 530 (Tex.Civ.App.—Austin 1931, no writ). The points are overruled.

■ Attempting an analogy between Mr. Dahl's suit and one for malicious prosecution in a criminal matter,[11] the Akins propose they were entitled to judgment because Mr. Dahl was obligated to prove he was of sound mind and had no mental illness, neither of which he proved. We do not subscribe to the proposition.

Respectable authority has stated that the elements required to establish an action for malicious prosecution are that a suit was instituted with malice, that it was brought

---

**10.** Coupled with the sixth point are complaints directed to special issue no. 2 and to the instruction accompanying special issue no. 1. However, inasmuch as these complaints were not voiced to the trial court during the Akins' objections to the charge, they are waived. Tex. R.Civ.Pro. 274; *Davis v. Campbell,* 572 S.W.2d 660, 663 (Tex.1978).

**11.** A suit for malicious prosecution in a criminal matter requires, according to the Akins' citation of *Parker v. Dallas Hunting and Fishing Club,* 463 S.W.2d 496 (Tex.Civ.App.—Dal-

las 1971, no writ), and other cases, these elements: "(1) the commencement of a criminal prosecution against plaintiff; (2) which has been caused by the defendant or through defendant's aid or cooperation; (3) which terminated in favor of the plaintiff by acquittal; (4) that plaintiff was innocent or not guilty of the charge against him; (5) that there was no probable cause for such proceeding; (6) that it was done with malice; and (7) which resulted in damages to plaintiff." *Id.* at 499.

without probable cause, and that the suit was terminated in favor of the plaintiff.[12] *Suhre v. Kott, supra,* at 418, and authorities there cited. Of course, the statement presupposes that the malicious prosecution caused damages, *Id.,* for the action falls unless the injured party pleads and proves damages resulting from some interference, by reason of the suit, with his person or property. *Pye v. Cardwell, supra.*[13]

As is evident from *Suhre,* the requisite elements are not enlarged to require proof of sanity and negation of mental illness by the fact that the basis of the malicious prosecution was a proceeding to establish mental incapacity. It is understandable when it is remembered that the law presumes an adult person to be of sound mind and capable of managing his own affairs, *Lindly v. Lindly,* 102 Tex. 135, 113 S.W. 750, 753 (1908), a presumption that obtains until and unless a party alleging the mental incapacity of the adult proves the allegation. *Hall v. Hall,* 352 S.W.2d 765, 767 (Tex.Civ. App.—Houston 1962, no writ). It follows that Mr. Dahl had no legal obligation to prove the soundness of his mental condition. The eighth point is overruled.

With their final two points, the Akins attack the verdict for damages. They argue briefly and generally, sans citation of authority and without specificity as to any of the elements passed on by the jury, that even with the trial court remittitur, the damages are so excessive that either a new trial or a further substantial remittitur is required. By his cross-point, Mr. Dahl asks that we restore the amount of damages remitted in the trial court.

Preliminarily, we observe that the Akins' two points do not comply with the specificity requirements of Rule 418, Texas Rules of Civil Procedure, and, therefore, they could

be considered to be waived. *Burgess v. Sylvester,* 143 Tex. 25, 182 S.W.2d 358, 360 (1944); *Hatch v. Davis,* 621 S.W.2d 443, 447 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). Still, the question of excessive damages was preserved for appellate review, and the points do direct our attention to the question raised; consequently, we will pass on the merits of the points, *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112, 114 (Tex.1976), particularly since Mr. Dahl has responded to the points without objecting to their sufficiency. *Williford v. Sharpe,* 578 S.W.2d 498, 499 (Tex.Civ.App.—Texarkana 1979, no writ).

However, it is not made to appear that we have jurisdiction to entertain Mr. Dahl's cross-point. Mr. Dahl has neither asserted nor have we noticed in the record that he made any complaint in the trial court as to the final judgment rendered, or that he gave notice of appeal therefrom. As a result, Mr. Dahl is in no position to now complain of the action of the trial court in effecting the remittitur and, therefore, we do not have jurisdiction to entertain his cross-point. *Texas Oil & Gas Corporation v. Vela,* 429 S.W.2d 866, 881 (Tex. 1968); *West Texas Utilities Company v. Irvin,* 161 Tex. 5, 336 S.W.2d 609, 611 (1960). The cross-point must be overruled.

Before arriving at its verdict for damages, the jury also had heard that Mr. Dahl, then 86 years of age, had achieved, before institution of the guardianship and mental illness proceedings, international stature as an outstanding architect, winning many design awards and professionally handling over a billion dollars of architectural work. He was the architect for private, county, and federal buildings in Dallas. He was the managing architect for all of the buildings

---

12. These same basic elements, as contrasted with the elements listed in marginal note 11, have been stated as also applicable for a malicious prosecution action arising from an unsuccessful criminal prosecution. *J.C. Penney Company v. Gilford,* 422 S.W.2d 25, 28 (Tex. Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.).

13. The requisite elements recently were enumerated differently by the Supreme Court in these words: "1) the institution or continuation of judicial proceedings; 2) by, or at the instance of the defendant(s); 3) malice in the commencement of the proceedings; 4) lack of probable cause for the proceedings; 5) termination of the proceedings in plaintiff's favor; and 6) damages." *James v. Brown,* 637 S.W.2d 914, 918 (Tex.1982).

for the 1936 Texas Centennial in Dallas, and participated in the design of the Cotton Bowl. Mr. Dahl served as architect for some seventeen of the buildings at the University of Texas in Austin, and for the recreational center on the East Texas University campus. He designed and built the 30 million dollar LTV Aerospace Center in Grand Prairie, which required innovation, imagination, and change. He is a member of the College of Fellows of the American Institute of Architects, an honor afforded only two percent of the architects in the nation.

Interrelated was testimony of Mr. Dahl's success as a businessman. Illustratively, he quadrupled the size of the trust to its present market value of at least two million dollars after distributions of almost one million dollars.

Mr. Dahl testified to the experience he underwent while hospitalized, saying that he suffered mental anguish, pain and tremendous sorrow and sadness from being incarcerated and charged with incompetence and in need of a guardian. He had great doubts about his employability after "going through all of the terrible publicity" of the incompetency charges, but he did concede he was employable as an architect in a consulting capacity, thinking he can qualify and do his work satisfactorily. But for the charges and institution of litigation by the Akins, he said he could be earning about $100,000 a year as an architect. He added that he had paid, as a result of the proceedings, over $200,000 in expenses.

Other witnesses gave testimony that the litigation instituted against Mr. Dahl had a damaging monetary effect and was damaging to the reputation of an architect. The institution of the proceedings was, according to an engineer witness, known in the community and was harmful, as well as, in the opinion of a banker witness, possibly injurious to Mr. Dahl's ability to obtain credit. An architect witness characterized the effect of the proceedings as detrimental, staggering, and irreparable, which could not be measured in money.

Having heard all of the evidence, the jury returned a verdict of $1,130,000 actual damages for malicious prosecution of the guardianship proceeding, allocating $500,000 as damages to Mr. Dahl's professional and personal reputation, $500,000 as compensation for his emotional distress, and $130,000 for his reasonable and necessary expenses, including attorney's fees. The jury declined to award any compensation for the element of loss of earning capacity or as exemplary damages.

Having heard the same evidence, the court suggested, and Mr. Dahl acquiesced to, a remittitur of $400,000 of each $500,000 the jury allocated for, respectively, reputation damages and emotional distress compensation. Resultantly, the verdict of damages arising from the guardianship proceeding became the following: $100,000 as reputation damages, $100,000 as emotional distress compensation, and $130,000 for expenses.

Also on the evidence, the jury returned a verdict of actual damages of $1,010,000 for malicious prosecution of the mental illness proceeding, allocating $500,000 as damages to Mr. Dahl's professional and personal reputation, $500,000 as compensation for physical and emotional distress, and $10,000 for his reasonable and necessary expenses, including attorney's fees. The jury also declined to award any compensation for loss of earning capacity, but did award $500,000 as exemplary damages.

On the same evidence, the court suggested, and Mr. Dahl acquiesced to, a remittitur of $400,000 of the $500,000 the jury allocated for reputation damages, and $250,000 of the $500,000 the jury awarded as exemplary damages. Resultantly, the verdict of damages arising from the mental illness proceeding became the following: $100,000 as reputation damages, $500,000 as physical and emotional distress compensation, $10,000 for expenses, and $250,000 as exemplary damages.

Early, it was established that the reasonable expenses necessarily incurred in defending a malicious prosecution may be recovered as actual damages. *Curlee v.*

*Rose,* 27 Tex.Civ.App. 259, 65 S.W. 197, 198 (Tex.Civ.App.—1901, no writ). Those expenses, which include attorney's fees, still are recoverable. *Eans v. Grocer Supply Co., Inc.,* 580 · S.W.2d 17, 23 (Tex.Civ.App.— Houston [1st Dist.] 1979, no writ). There is record evidence that Mr. Dahl's reasonable and necessary attorney's fees and expenses for defending the guardianship and mental illness proceedings were, respectively, $139,-064.27 and $10,516.43, each of which exceeds the respective amounts found by the jury. There is no direct challenge to the bases for the jury's awards of expenses. Hence, this portion of the verdict is not vulnerable to the Akins' attack on the monetary awards for excessiveness.

The inquiry, then, is whether the monetary recoveries decreed in the judgment to compensate Mr. Dahl for damage to his professional and personal reputation and for his emotional and physical distress, and for exemplary damages, are excessive under the facts of this cause. In deciding the question, all we can do is exercise sound judicial judgment and discretion in ascertaining what amounts would be reasonable compensation for the injuries sustained. Once the reasonable compensation is determined, any excess above that amount is subject to remittitur. *Wilson v. Freeman,* 108 Tex. 121, 185 S.W. 993, 994 (1916).

There is no certain measure of damages for the varying degrees of harm caused to reputations or distress inflicted on persons by malicious prosecutions. Hence, in such instances, the measure of damages generally rests in the composite judgment and conscience of the jury. *Norwood Bldg. v. Jackson,* 175 S.W.2d 262, 266 (Tex.Civ.App.— Waco 1943, writ ref'd w.o.m.). Because the limits of the jury's discretion are vaguely defined, it often is said that in the absence of circumstances tending to show that the jury's award was the result of an improper motive, or the award is so excessive as to shock the court's sense of justice, the jury's verdict should not be disturbed, *Eans v. Grocer Supply Co., Inc., supra,* at 23, if there is any probative evidence to sustain the award. *Texas Const. Service Co. of Austin v. Allen,* 635 S.W.2d 810, 812 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.).

Nevertheless, a trial court may exercise its sound judicial judgment and discretion to ascertain what amount would be reasonable compensation for the injury sustained, and treat the balance of the damages found by the jury as excess. Upon determining an amount that would be reasonable compensation, the court should authorize a remittitur of the excess. *Flanigan v. Carswell,* 159 Tex. 598, 324 S.W.2d 835, 840 (1959). This is what the trial court did.

In determining actual damages resulting from malicious prosecutions, the evidence bearing on injury to reputation and to mental and physical distress, and the reasonable inferences drawn therefrom, are entitled to consideration. *Equitable Life Assur. Society v. Lester,* 110 S.W. 499, 502 (Tex.Civ. App.—1908, no writ). The evidence heretofore summarized not only contains direct testimony of damage to Mr. Dahl's professional and personal reputations, but it supports the reasonable inference that his reputations were grossly injured, by the fact that he was maliciously prosecuted. *Green v. Meadows,* 527 S.W.2d 496, 499 (Tex.Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). Furthermore, Mr. Dahl's testimony of the circumstances of the malicious prosecutions and their effects on him supports the finding that he suffered mental and physical distress therefrom. The measurement of the distress in monetary terms is a discretionary one. *Id.* ·

In determining exemplary damages, the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoers, the situation and sensibilities of the parties concerned, and the extent to which such conduct affects a public sense of justice and propriety, are proper matters for consideration. *First Security Bank & Trust Co. v. Roach,* 493 S.W.2d 612, 619 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.). All of these matters were raised by the evidence and the reasonable inferences flowing therefrom. Again, there is no precise measurement in monetary terms of exemplary damages and, again,

the measurement is a discretionary one, *Id.,* although the amount of exemplary damages should be reasonably proportioned to the actual damages found. *Southwestern Investment Company v. Neeley,* 452 S.W.2d 705, 707 (Tex.1970). Moreover, when a party is entitled to exemplary damages in an action for malicious prosecution, the jury may consider his expenses, including his attorney's fees, in prosecuting the action. *Landa v. Obert,* 45 Tex. 539, 544 (1876). There was evidence that Mr. Dahl's attorney's fees and expenses at the time of trial were, respectively, $37,040.50 and $2,231.19, a total of $39,271.69.

■■■ Throughout our consideration of the question whether the damages decreed are excessive, we have been mindful that it was the jury and the trial court, not us, who saw the witnesses, heard them testify, and were in the best position to judge their credibility and the weight to be given their testimony. Given the evidence and the jury's composite judgment thereon, the trial court's ascertainment of the reasonable compensation for the injuries sustained and the effected remittitur of the excess thereof, the ratio between actual and exemplary damages, and our standard of review, we are unable to say that the damages decreed, or any portion of them, are so excessive as to require a further remittitur. Points nine and ten are overruled.

The judgment rendered in Cause No. 78–11230–L is affirmed.

### No. 9340—Note and Stock Suit

As the pleadings were cast for trial in Cause No. 78–12590–H on the docket of the 160th Judicial District Court, Mrs. Akin, individually and as trustee for two of the Akin children, George Akin and Laurel Akin, who had attained legal majority and also joined individually, sought judgment against Mr. Dahl on three notes and for return of the Hargrove Electric Company, Inc. stock certificate. The notes, each of which was stated to be a renewal, carried the signature of Mr. Dahl as an individual maker, and they were identified as:

1. A 1 January 1974 note in the principal amount of $274,702.26, bearing interest at the rate of 7.5% per annum payable monthly, and made payable to the order of Gloria Akin on or before one year after date;

2. A 3 June 1976 note in the principal amount of $38,500, bearing interest at the rate of 6% per annum, and made payable to the order of Mrs. Gloria Akin, trustee for George Akin, on or before one year after date; and

3. A 3 June 1976 note in the principal amount of $38,500, bearing interest at the rate of 6% per annum, and made payable to the order of Mrs. Gloria Akin, trustee for Laurel Akin, on or before one year after date.

The Hargrove stock certificate sought to be returned was the one previously mentioned as having been delivered to the trust by First National Bank in Dallas when it assigned and delivered the Teletronics note and security agreement, together with the Akins' guaranty, to the trust upon its payment of the balance due on the Teletronics note.

As material to this appeal, Mr. Dahl impleaded Justice Akin and alleged, inter alia, that the $274,702.26 note made payable to Mrs. Akin was discharged by her material alteration of it, that the prosecution of the action on it was barred by limitation, and that the obligation was, by agreement, not to become due and payable until his death as a claim against his estate. He further pleaded that the Hargrove stock certificate was security for the trust's payment of the $107,781 for the Teletronics note, and that the Akins are not entitled to its return until they pay the trust.

As a part of his pleadings, Mr. Dahl alleged that if any of the obligations represented by the three notes is now due and owing, the obligations should be paid from the assets, and pursuant to the provisions, of the trust, for otherwise he cannot, from his sources of income, support and maintain himself in the station of life to which he is accustomed. He further alleged that if the $274,702.26 note is a subsisting obligation,

the $107,781 paid by the trust to discharge the Akins' community obligation on the Teletronics note, and the $174,723.06 the trust assertedly lost on the McKinney Street property transaction with the Akins, should be allowed as off-sets.[14]

With respect to this cause, the trial court inquired of the jury, and the jury found, under our paraphrasing of the numbered special issues, that

(16) when the trust purchased the $107,782 Teletronics note, both Mr. Dahl and the Akins agreed that the debt was discharged;

(17) the Akins relied on the discharge as extinguishment of the $107,782 indebtedness in not pursuing other security and Teletronics, Inc. for such amount;

(18) the sale of the "McKinney Street" properties to the trust for $318,600 was a completed transaction without any agreement to adjust the price paid dependent upon what the trust might later sell the properties for; and

(19) the trust incurred a monetary loss on account of the "McKinney Street" properties transaction,

(20) in the amount of $100,000.

The jury failed to find that (26) the First National Bank in Dallas delivered to the trust the Hargrove stock certificate together with the stock power and security agreement of Justice Akin in return for the payment of the Akins' guaranty agreement of the Teletronics note, but the jury found that (27) Justice Akin pledged the Hargrove stock to the trust for his indebtedness to the trust.

Based on the jury's verdict pertaining to this cause of action and the court's recited findings, judgment was rendered decreeing, in essence, that

1. Gloria Akin, individually and as trustee for George Akin, and George Akin individually, recover from Mr. Dahl $52,931.70 (the original principal of, and the accrued interest and attorney's fees on, the $38,500 note), with post-judgment interest at nine percent per annum;

2. Gloria Akin, individually and as trustee for Laurel Akin, and Laurel Akin individually, recover from Mr. Dahl $52,-931.70 (the original principal of, and the accrued interest and attorney's fees on, the $38,500 note), with post-judgment interest at nine percent per annum;

3. The 1 January 1974 instrument sued on as a note in the principal amount of $274,702.26, with interest at 7.5% from date, is not effective as a note, but represents a debt of $274,702.26 owed by Mr. Dahl to Gloria Akin that, by the 1969 agreement, shall become due and payable, without interest, upon Mr. Dahl's death from his estate;

4. Mr. Dahl take nothing by his cross-claims, and he is not entitled to any off-sets against the notes and debts; and that

5. Mr. Dahl immediately deliver the Hargrove stock certificate to the Akins.

Both Mr. Dahl and Mrs. Akin have appealed from the judgment.

Mr. Dahl predicates his appeal upon seventeen points of error. The points may be grouped into these charges of error by the trial court: in not finding as a matter of law that, or in not submitting his requested jury issue to determine whether, the payment of the two $38,500 notes would result in his not being able to support himself in the station in life to which he has become accustomed out of his income from all other sources; in failing to find that Mrs. Akin's refusal to direct payment of the two $38,500 notes by the trust was arbitrary conduct, and to order payment of those notes out of the trust; in not ruling as a matter of law that the $274,702.26 indebtedness was barred by material and fraudulent alterations and limitations, and that Mrs. Akin was estopped to bring suit on the note; in ruling that the Hargrove stock certificate should be returned to the Akins and in not ruling that the return was barred by limitations; in refusing to grant his motion for

14. Additional claims advanced by Mr. Dahl, and resisted by the Akins, for recovery of various items of personal property were resolved by the jury and the court's judgment without being challenged in this appeal.

judgment non obstante veredicto with regard to special issues nos. 16, 17, 18, 19 and 26 on the basis that there was no evidence to support the jury's findings; and in not conditioning the return of the Hargrove stock certificate upon the Akins' payment to the trust of $207,781, the sum of the $107,781 paid by the trust to discharge the Akins' Teletronics note balance and the $100,000 the trust lost in the McKinney Street property transaction, plus attorney's fees.

Mrs. Akin's dissatisfaction with the judgment is expressed in and under her two points of error. By these points, she submits that she was and is entitled to judgment on the $274,702.26 note with interest at the rate of 7.5% per annum from 1 January 1974.

In resolving the appeals, our address will be to the subject matters of the points of error generally rather than by a consideration of the points seriatim. With this approach, we first address Mr. Dahl's complaints of error to the adjudication of his present liability for the two $38,500 notes.

At trial, when Mr. Dahl, after testifying that he was worth "probably about a million dollars," was asked if he could pay the two $38,500 notes, he answered: "I owe them, they are to be paid. I'm not in a position to pay them now, I haven't got the money." Thereafter on redirect examination, Mr. Dahl's comptroller, who fixed the market value of Mr. Dahl's assets at $903,000, was asked and answered the following:

Q Directing your attention to the three notes sued on by the Akins, one in the approximate amount of 274,000 some-odd dollars to Gloria; one in the amount of $38,500 to Laurel; another in the amount of $38,500 to George. Does Mr. Dahl have the ability to pay those notes out of his assets.

A No.

Q All right. I understood him to say that he had a million dollars in assets, so, he does have the ability, doesn't he?

A Well, I understood you to say out of income. Out of his assets, yes.

Q Okay. Do you know Mr. Dahl's estate, Mr. Dahl's estate?

A Yes.

Q You know its contents?

A Yes.

Q Do you know its earnings?

A Yes

Q All right. If he were required to pay any of those notes, would there be sufficient income producing ability of his assets to pay his living expenses in the station to which he has become accustomed, out of the income solely?

A No.

It was stipulated that Mrs. Akin had refused Mr. Dahl's request that she authorize the trust to pay the notes.

The crux of Mr. Dahl's complaints is contained in his contention that if he has to pay the two $38,500 notes, then, under the evidence, he cannot, out of his income, support and maintain himself in the station in life to which he is accustomed and, therefore, he is entitled, under the language of the trust, to have the notes paid out of trust funds. We do not subscribe to the contention.

The trust language to which Mr. Dahl refers is recorded in the forepart of this opinion. It is unambiguous and clearly expresses the intention of the trustor. There is no expressed intention that trust funds are to be expended in payment of Mr. Dahl's obligations as they become due and payable; rather, the expressed intention is that, by Mrs. Akin's direction, trust funds shall be paid to Mr. Dahl in amounts necessary to supplement his income from all other sources to support and maintain him in the station in life to which he is accustomed, conditioned that his income is insufficient for that purpose. The intention expressed at the time the trust was created is determinative, *Cutrer v. Cutrer,* 162 Tex. 166, 345 S.W.2d 513, 519 (1961), and that intention is not stated to encompass the payment of Mr. Dahl's maturing obligations.

Reasonably deducible from Mr. Dahl's argument is the theory that, although there is no language expressly authorizing the expenditure of trust funds to retire his maturing debts, the payment of the two notes out of trust funds accomplishes the trustor's direction that he receive sufficient trust funds to accommodate his station in life. The theory, tested by the trust language, is untenable; for, though the mechanics employed to secure trust funds for the purpose authorized may seem unimportant, nevertheless, the trustor expressed the condition of and limitations upon the payment of the funds. The court cannot change the trustor's expressed intention, either by adding anything to or by subtracting something from the trust. *Jackson v. Templin,* 66 S.W.2d 666, 671 (Tex.Comm'n App.1933, judgmt adopted). The principle is peculiarly applicable here where the payment to Mr. Dahl does, in effect, alienate and convey trust funds otherwise belonging to others under the provisions of the trust. Under that circumstance, the grant of power for payment must be strictly followed. *Accord, Slaughter v. Qualls,* 139 Tex. 340, 162 S.W.2d 671, 675 (1942).

If, as Mr. Dahl contends, his payment of the amounts due on the notes out of his income will result in a deficiency in the amount required to support and maintain him in his accustomed station in life, then he will have a right to call upon the trust to supply the deficiency. But until that condition is evidenced, the trust provides him no relief.

■ There is another reason why the court did not err in failing either to hold as a matter of law that, or to submit the requested issue for a determination whether, the payment of the two $38,500 notes would result in the inability of Mr. Dahl to support and maintain himself in his accustomed station in life out of his income from all other sources. To merit the court so holding, Mr. Dahl's evidence had to be such that the holding was compelled, *White v. White,* 141 Tex. 328, 172 S.W.2d 295, 296 (1943); or, absent the compelling evidence,

Mr. Dahl, to be entitled to the jury submission, had to produce evidence of a probative force sufficient to raise the issue for the jury's determination. *Air Conditioning v. Harrison-Wilson-Pearson,* 151 Tex. 635, 253 S.W.2d 422, 425 (1952). But, here, the evidence did not warrant either a court holding or a jury submission.

At most, the evidence on the matter, all of which has been quoted above, amounts to no more than a bare opinion or conclusion that if Mr. Dahl is required to pay the two $38,500 notes he will not have sufficient income to accommodate his accustomed station in life. The testimony does not show the amount of Mr. Dahl's income from any source, or his obligations, or the cost of maintaining his life style. Under the conclusional evidence, the court or jury would have to speculate on the underlying facts to arrive at some decision which, of necessity, would be based only on surmise.

Testimony which goes no further than creating a mere surmise or suspicion of the existence of the fact to be established is not, in legal contemplation, any evidence of the fact. *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059, 1064 (1898). And the naked or unsupported opinion or conclusion of a witness does not support a jury finding even when admitted without objection. *Dallas Railway & Terminal Company v. Gossett,* 156 Tex. 252, 294 S.W.2d 377, 380–81 (1956). It follows, then, that there being an absence of any evidence of probative force on the fact at issue, the trial court did not err in failing to make the holding sought or in refusing the submission of the issue requested.

Next, we notice the multiple contentions concerning the court's decree that the $274,-702.26 debt incurred by Mr. Dahl to Mrs. Akin is a non-interest bearing indebtedness becoming due upon Mr. Dahl's death and payable from his estate. A further reference to the evidence is helpful.

The Akins introduced, as their first exhibit, an identified true and correct copy of the original note in the following form:

**PROMISSORY NOTE** Renewal TEXAS STANDARD FORM THE ODEE COMPANY PUBLISHERS DALL

$274,702.26 _____ Dallas _____, Texas _____ January 1 · _____ A. D. 19-74

ON OR BEFORE ONE YEAR******************************************_after date, for value received,
I, we. or either of us, the undersigned, promise to pay to the order of
*-*****GLORIA AKIN*******************************************************

_____Dollars

at_ Dallas, Texas _____ with 7.5 _____per cent interest per annum from
_ January 1, 1974 _____until paid. Interest only payable monthly as it accrues.

DUE_ January 1, 1975 _____
Renewal of two notes dated July 1,
1973 for $213,202.26 and $61,500.00
PHONE_____

GEORGE L. DAHL, an individual

Later, it was shown that during the trial, Mrs. Akin had written on the original note the script amount corresponding to the figure amount, making the note appear thusly:

**PROMISSORY NOTE** Renewal TEXAS STANDARD FORM THE ODEE COMPANY PUBLISHERS DALLA

$274,702.26 _____ Dallas _____, Texas _____ January 1 _____ A. D. 19-74

ON OR BEFORE ONE YEAR******************************************_after date, for value received,
I, we, or either of us, the undersigned, promise to pay to the order of
********GLORIA AKIN*******************************************************

Two hundred & seventy four thousand seven hundred two and 26/100 —Dollars
at_ Dallas, Texas _____ with 7.5 _____per cent interest per annum from
_ January 1, 1974 _____until paid. Interest only payable monthly as it accrues.

DUE_ January 1, 1975 _____
Renewal of two notes dated July 1,
1973 for $213,202.26 and $61,500.00
PHONE_____

GEORGE L. DAHL, an individual

Mr. Dahl's comptroller testified that he prepared the note for $274,702.26 as a renewal of the previous notes.

During the testimony of the comptroller, there was introduced into evidence the previously mentioned and partially quoted 1969 agreement executed by Mr. Dahl and the Akins. As quoted, the instrument provides that Mr. Dahl's personal notes would be renewed annually without interest and would continue to be held by Mrs. Akin to be collected from his estate upon his death. The Akins unsuccessfully objected to the receipt of the instrument, grounding their objection on the parol evidence rule and arguing that by the instrument, Mr. Dahl was attempting to vary the plains terms of his note.

The comptroller, who prepared the 1969 instrument and the 1974 note, testified that the $274,602.26 amount represented the unpaid principal balance on 1 January 1974 of Mr. Dahl's previous notes aggregating $294,702.26 at the time the 1969 instrument was executed. He explained that the interest provision was included in the 1974 note to alleviate the Akins' financial difficulties after Mr. Dahl determined in 1973 that approximately $20,000, additional to the Akins' other income, would be sufficient to meet their living expenses. The interest payments, made monthly in the approximate amount of $1,700, continued until Mr. Dahl was arrested on the court's warrant in 1978, after which no interest payments have been made.

Under the record, it suffices to consider generally, and not individually, the contrasting contentions advanced by the parties for the nonenforceability of the indebtedness and the invalidity of the note vis-a-vis the validity and enforceability of the note. The parties agree that the instruments are unambiguous, the facts are undisputed, and no jury issues were involved in this phase of the litigation.

Mr. Dahl introduced the 1969 agreement without limiting or qualifying it in any manner. He does not now suggest that it has been amended or superceded. He, therefore, became bound by the agreement, and will not be heard to attack it, *Freed v. Bozman,* 304 S.W.2d 235, 241 (Tex. Civ.App.—Texarkana 1957, writ ref'd n.r. e.), particularly since he defends, instead of attempting to disprove, the facts stated therein. *Hillman v. Hillman,* 138 Tex. 111, 157 S.W.2d 143, 145 (1941). Then, based upon the 1969 agreement, Mr. Dahl developed the evidence to show that the $274,-702.26 note, depicted by the Akins' first exhibit, represented the balance of the indebtedness that was owed at the time the agreement was executed. Having done so, the trial court was justified in determining that he is in no position to deny the validity of the indebtedness by asserting contentions which depend for their support on the impeachment of his documentary evidence or a part thereof. *See, generally, Lock v. Morris,* 287 S.W.2d 500, 501–02 (Tex.Civ. App.—Texarkana 1956, writ ref'd n.r.e.), and authorities there cited.

Similarly, the Akins do not dispute the 1969 agreement or contend that it has been amended or superceded. What they do contend is that the agreement may not operate to vary the terms of payment of the 1974 note, citing *Kuper v. Schmidt,* 161 Tex. 189, 338 S.W.2d 948 (1960), for that principle, and that, therefore, Mrs. Akin is entitled to judgment on the note according to its tenor. However, *Kuper* is also authority for the principle, echoed in the Texas Business and Commerce Code Annotated, § 3.306(3) (Vernon 1968), that delivery upon a condition or for a special purpose only always

may be shown as between the immediate parties. *Id.* at 952.

The court was provided with undisputed facts showing that Mr. Dahl would document his indebtedness to Mrs. Akin by his non-interest bearing notes renewed annually, the latest of which was the 1974 note Mrs. Akin sued upon, which was to be paid at his death from his estate. The undisputed testimony was that Mr. Dahl gratuitously had included the interest provision in the note only to alleviate the Akins' financial difficulties.

The evidence presented to the court was sufficient for it to find that the 1974 note, though absolute in form and delivered to the manual possession of Mrs. Akin, was delivered, pursuant to the 1969 agreement, for the special purpose of recording Mr. Dahl's indebtedness to Mrs. Akin, and that the note was not intended to take effect as a binding obligation for the purpose of transferring the property in the instrument until and unless at Mr. Dahl's death it then evidenced the amount of his principal indebtedness to Mrs. Akin. Hence, the court was warranted in finding that the note was not effective as a note, for the delivery for a special purpose is a good defense to the enforcement of the note in this suit. *Rector v. Evans,* 6 S.W.2d 105, 107 (Tex. Comm'n App.1928, holdings approved). *See, also, Moser v. John F. Buckner & Sons,* 283 S.W.2d 404, 406–07 (Tex.Civ.App.— Waco 1955, no writ). Accordingly, there was no error in the court's decreeing that the 1974 note represents a non-interest bearing indebtedness payable to Mrs. Akin at Mr. Dahl's death from his estate.

By a group of points, Mr. Dahl attacks the jury's answers to special issues nos. 16, 17, 18, 19 and 26, heretofore paraphrased, on the ground that there is no evidence to support each of the jury's findings. Included in this grouping is Mr. Dahl's sixteenth point by which he contends the court erred in overruling his motion for judgment non obstante veredicto because there is no evidence to support the jury's "finding" to special issue no. 26. That issue, as noted, inquired whether the jury found that the

First National Bank in Dallas delivered to the trust the Hargrove stock together with the stock power and security agreement of Justice Akin in return for the payment of the Akins' guaranty agreement of the Teletronics note. The jury answered "we do not," thereby failing to find the fact inquired about.

In drafting his sixteenth point and in casting his argument thereunder, Mr. Dahl erroneously assumed that the jury's "we do not" answer to the inquiry into the existence of the fact upon which he had the burden of proof is an affirmative finding of the non-existence of the fact. However, properly interpreted, the "we do not" answer is nothing more than a failure or refusal by the jury to find from a preponderance of the evidence the fact which Mr. Dahl had the burden to affirmatively establish, and simply means that he failed to discharge his burden of proof. *C & R Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966). Mr. Dahl does not suggest that he established the fact inquired about as a matter of law; therefore, the sixteenth point is unavailing, for a failure to find need not be supported by evidence. *Traylor v. Goulding,* 497 S.W.2d 944, 945 (Tex.1973).

In determining the efficacy of the no-evidence attacks on the jury's findings to special issues nos. 16, 17, 18 and 19, we must consider only the evidence and inferences tending to support the findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). The determination necessitates further reference to the evidence.

When the trust paid $107,781 to First National Bank in Dallas in 1972 to discharge the Akins' liability to the bank as guarantors on the Teletronics note, the trust received from the bank an assignment of the note and security agreement and the Akins' guaranty, together with the delivery of the Hargrove stock certificate and the stock power Justice Akin had executed in blank to secure another indebtedness to the bank. Although the payment to the bank was not handled as a distribution of trust funds, the trust did not treat the payment as an account owing by Justice Akin, request him to sign a note as an indicia of indebtedness, or take any legal action to enforce the note against the Akins or Teletronics. For the trust year of 1973 or 1974, the trust reported the payment as a bad debt for income tax purposes.

In late 1975, Mr. Dahl's accountant questioned in writing whether the treatment given the Teletronics note pay-off and the McKinney Street property transaction might jeopardize the independent status of the trust and cause the Internal Revenue Service to include the value of the trust in Mr. Dahl's estate at his death. He suggested to Mr. Dahl that negotiations should be conducted to establish Justice Akin's liability to the trust on the Teletronics note transaction, and that proceeding against the Hargrove stock to recover such liability could eliminate the tax hazard. Mr. Dahl transmitted the accountant's memorandum to Justice Akin with a covering letter urging an immediate settlement of the matters; however, as it appears from the evidence, no affirmative action was taken to collect on the trust's payment until Mr. Dahl's counterclaim was filed in this suit on 12 December 1979.

Justice Akin testified that in lieu of distributions from the trust, the payment was made by the trust to the bank upon the initiative of Mr. Dahl and his comptroller for tax reasons, and that the comptroller suggested the McKinney Street property transaction. It was Justice Akin's understanding that the trust's payment to the bank "was not to create any indebtedness at all." He made no attempt to proceed against Teletronics to pay its note because Teletronics was a going concern,[15] and the trust was going to write off the payment. His reason for not proceeding against Tele-

---

**15.** Subsequent to the trust's payment to the bank, both the trust and Mr. Dahl made loans to Teletronics, the amount of Mr. Dahl's personal loan being $50,000, and in 1974, Justice Akin invested another $22,000 in Teletronics before it ceased doing business in January of 1975.

tronics was that he relied both on the position the trust took that it needed a write off and on the write off itself.

Further testifying, Justice Akin stated that the McKinney Street property transaction was to avoid a distribution from the trust that would be taxable, and that there was no discussion of his being indebted to the trust, or of the trust making any claim on him, for a deficiency on the liquidation of the properties. After testifying about the mechanics of the transaction, including the sales prices of the McKinney Street property tracts, the amounts of existing mortgages paid, the resulting net amounts, and inferring the values of the three tracts unsold, the comptroller concluded that the trust "about broke even on the thing [the McKinney Street property transaction]."

Having heard the evidence, and considering the reasonable inferences to be drawn from it, the jury reasonably could believe that the trust was looking not to the Akins, but to Teletronics, as a going concern, for payment of its note, thereby enabling the Akins to rely on a discharge of any liability for the trust's $107,781 payment in their not taking action to recoup the payment amount, and that the McKinney Street property transaction was an accomplished sale without recourse on the Akins. After reviewing the evidence under the applicable standard, we find that there is some evidence of probative force to support each of the jury's findings to special issues nos. 16, 17, 18 and 19. There being no question as to the factual sufficiency of the evidence in support of the findings before us, the findings must be taken as established.

With these findings intact, the jury's finding to special issue no. 20 became immaterial, and the court was justified in disregarding the answer. *C & R Transport, Inc.*

*v. Campbell, supra.* Consequently, Mr. Dahl failed to establish a debt owed by the Akins, either for the Teletronics note payment or for the McKinney Street property transaction.

■ Without a debt, there could be no lien impressed by Mr. Dahl on the Hargrove stock, even though at one time Justice Akin had pledged the stock to secure any indebtedness he owed the trust, for a specific debt—an obligation to pay money—is necessary to support a lien. *Calvert v. Hull,* 475 S.W.2d 907, 911 (Tex.1972). As a consequence, the court did not err in ordering the return of the Hargrove stock certificate to the Akins.

Our address of the subject matters has embraced all of Mr. Dahl's seventeen points of error and Mrs. Akin's two points of error. All points are overruled.

The judgment rendered by the trial court in Cause No. 78–12590–H is affirmed.

### *No. 9339—Trust Suit*

By her pleadings in Cause No. 79–904–A on the docket of the 14th Judicial District Court, Mrs. Akin sought the removal of Mr. Dahl as trustee of the Lille E. Dahl Trust, a sworn accounting of the trust funds, and injunctive protection for the funds during the pendency of the suit. In response, Mr. Dahl interposed two affirmative defenses to the suit and joined the issues by his general denial.[16]

As the court's consolidated submission pertained to this suit, the jury found, in answering the numbered special issues, that

(21) Mr. Dahl has developed such hostility toward Gloria Akin that his decisions as Trustee in administering the funds of the Lille E. Dahl Trust will

---

**16.** In this suit, Mr. Dahl, as he did in Cause No. 78–12590–H on the docket of the 160th Judicial District Court, counterclaimed to recover from the Akins their alleged indebtedness of $107,-781 for the Teletronics note payment and their alleged indebtedness of $174,723.06 resulting from the McKinney Street property transaction, and to foreclose the trust's alleged lien on the Hargrove stock. These matters were adjudicated in the judgment rendered in Cause No.

78–12590–H and, in the appeal from that judgment, the matters were resolved adversely to Mr. Dahl's contentions by our judgment in our Cause No. 9340. We, therefore, overrule Mr. Dahl's points of error numbered four through twelve which are directed to the adjudication of these matters in the judgment rendered in Cause No. 78–12590–H, and we do not notice them further in this appeal.

probably be influenced adversely to the interest of Gloria Akin,

and that

(22) Mr. Dahl has developed such hostility toward the Akin children that his decisions as Trustee in administering the funds of the Lille E. Dahl Trust will probably be influenced adversely to the interests of the Akin children.

The jury failed to find that Mr. Dahl considers (23) Gloria Akin or (24) the Akin children unfit to receive benefits from the trust, or that (25) Mr. Dahl is mentally incompetent to manage the financial affairs of the trust.

Accepting the verdict, the court entered an additional finding "that the undisputed facts in this case establish that said Trustee [George L. Dahl] has been guilty of improper conduct in the management of the trust estate." The court then rendered judgment removing Mr. Dahl as trustee and, further finding that his removal should require the voiding of his special power of appointment under Mrs. Dahl's will, decreed that Mr. Dahl's special power of appointment is voided and is of no force and effect.

By his three viable points of error in his appeal, Mr. Dahl contends that the trial court erred (i) in going to trial without joining and serving the Akins' minor children as necessary and indispensable parties, (ii) in removing him as trustee, and (iii) in voiding the power of appointment given him under the will of Mrs. Dahl. We will consider the points in the order presented.

■■■ The two children of the Akins who were minors at the time of the trial were not made parties to the lawsuit. Their absence was not objected to before trial and became a matter of concern only when the court heard the motions for judgment. Mr. Dahl now charges the court erred in going to trial without their joinder as necessary and indispensable parties to the court's jurisdiction. Assuming that the minors should have been joined, still, under the facts of this cause, we detect no reversible error.

The early equitable rule was that in suits affecting trust property, the beneficiary al-

ways was a necessary party; however, the rule is limited by many exceptions. *Slay v. Burnett Trust,* 143 Tex. 621, 187 S.W.2d 377, 382 (1945). One of the exceptions, as stated in *Mason v. Mason,* 366 S.W.2d 552, 554 (Tex.1963), is "that the beneficiary is a necessary party only if a complete determination of the controversy cannot be had unless he is a party."

In 1970, Rule 39, Texas Rules of Civil Procedure, was rewritten to provide the basis for determining whether the action should proceed in the absence of parties who should be joined in an action. As material here, the rule provides:

Rule 39. Joinder of Persons Needed for Just Adjudication.

(a) Persons to be Joined if Feasible. A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.

(b) Determination by Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief,

or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

The rule emphasizes the question whether the court ought to proceed with the parties present before the court rather than whether an absent party is essential to the court's jurisdiction. *Cooper v. Texas Gulf Industries, Inc.,* 513 S.W.2d 200, 204 (Tex.1974).

In this cause, the major issues joined at the time of trial were: (a) whether Mr. Dahl should be removed as trustee and, as it developed; (b) whether his power of appointment should be voided; (c) the question of the Akins' indebtedness to the trust; (d) the status of the Hargrove stock; and (e) whether Mr. Dahl's notes should be paid by trust funds. However, as this cause was postured for trial, the only issues for adjudication were whether Mr. Dahl should be removed as trustee and his power of appointment avoided. The correct adjudication of these issues would not subject the trustee or remaining beneficiaries to a substantial risk of incurring any liability additional to that adjudicated because of the absence of the minor children. Thus, the interests of the trustee and all beneficiaries of the trust could be adjudicated and complete relief could be given without the joinder of the minors. *Accord, Vondy v. Commissioners Court of Uvalde Cty.,* 620 S.W.2d 104, 105–07 (Tex.1981).

A practical factor we consider is that this cause has been tried to a jury verdict without the nonjoinder of the minors being made an issue. Rule 39 includes within its subdivision (b) practical considerations for shaping a decree of adjudication between the parties joined. Mr. Dahl does not suggest that the judgment rendered would have been different had the minor children been joined as parties. Neither does he suggest that the decree fashioned did not accord complete relief or run counter to the interests of the minor children.

Thus, in the context of the litigation, the joinder of the minor children was not so crucial that the judgment rendered should be vacated because of their nonjoinder. The first point of error is overruled.

By his second point, Mr. Dahl challenges his removal as the trustee of the trust. The removal is predicated, as the judgment makes clear, upon the jury's factual findings that Mr. Dahl has developed such hostility toward the beneficiaries that his decisions will probably be influenced adversely to the beneficiaries, and the court's finding that as a matter of law Mr. Dahl has been guilty of improper conduct in the management of the trust estate.

At the hearing on motions for judgment, the court announced "I'm going to enter a judgment on the verdict, removing him [Mr. Dahl as trustee]." The record does not reveal how or why the court's finding became a part of the predicate for the removal of Mr. Dahl, unless it can be inferred from the court's remarks at the hearing.

On one occasion, the court said, "I feel that Mr. Dahl abused the power of the trustee when he loaned this money to the Akins with the understanding they were going to give it right back to him on a loan. I think he abused his power as trustee there." On another occasion, the court commented:

> But I'll let you argue about the propriety of Mr. Dahl in this note dealing. That struck me at the time as being improper. He was using it for his own benefit, and I don't care if he did put most of the money in that trust, that still doesn't give him a right to use the trust for his own benefit.
>
> I'll admit he put three-fourths or four-fifths of the money in the trust. If the trustee gives money to it, or takes money, if he used it improperly, in my opinion that is grounds for removal. Now, that itself might not be, but I think that the jury finding is enough to remove him as trustee.

In this regard, the Akins identify the event as the one where Mr. Dahl made distributions from the trust to Mrs. Akin and then

borrowed the money from her as evidenced by his $274,702.26 note.

The Akins also represent, in support of the court's finding, that the evidence, which is indicated by only one reference to the record, shows Mr. Dahl used trust funds for speculative purposes by investing trust money in Teletronics after it was in serious trouble, and for the purchase of the Teletronics note for $107,782 when it was in default. Aside from the reality that there is no indication the court deemed this evidence to conclusively establish improper conduct by Mr. Dahl, the evidence to which we are referred is not so definite. The evidence is the testimony of Mr. Dahl's comptroller who, at that point, said trust funds, the amount of which he could not remember, were put in Teletronics after it got in financial trouble, but at that particular time, the thought was that Teletronics would be a going company. And, interestingly, the Akins' representation of improper conduct by Mr. Dahl for the trust's purchase of the Teletronics note ignores the actualities that the purchase relieved the Akins of their $107,782 liability to the bank, which had filed suit against them for that amount, and that Mr. Dahl was attempting to establish the Akins' liability to the trust for the amount paid for the note. But, in any event, in the state of the record, there is evidence from which a fact finder could find that the Akins were willing participants in, if not the instigators of, the questioned transactions which were for their financial advantages.

Adverting to the jury findings, they establish that Mr. Dahl had developed such hostility toward the trust beneficiaries that his decisions in administering the trust funds will probably be influenced adversely to their interests. We have perused the authorities of other states cited by the litigants for the holdings that, in special cases, antagonistic relations between the trustee and the cestui que trust have been deemed both sufficient and insufficient reasons for removal of the trustee. But the sound rule in Texas, and the one we apply, is that "a trustee may not be removed merely because of ill will, where it is not inconsistent with the faithful performance of the duties of the office or to the special interest of the beneficiary." *White v. White,* 15 S.W.2d 1090, 1093 (Tex.Civ.App.—Texarkana 1929), *writ dism'd,* 25 S.W.2d 826 (Tex.Comm'n App.1920).

It is to be remembered that, in constituting the trust and naming Mr. Dahl the initial trustee, Mrs. Dahl provided that the trustee shall not be liable for any mistake or error in judgment, and that payments to the beneficiaries were at the sole discretion of the trustee. In this cause, there has been no finding that Mr. Dahl's hostility has, in fact, affected his integrity and discretion during his trusteeship. There is no contention on appeal that Mr. Dahl violated any express trust provision with a resultant loss to the trust, converted any of the trust property to his own use, impaired the assets of the trust, or acted corruptly or dishonestly in any respect in the management of the trust.

Given the state of the evidence, any question of improper conduct by Mr. Dahl in the management of the trust remains an unresolved issue of fact. The fact was not, contrary to the court's finding that it was, established by the evidence as a matter of law. *Compare Yturri v. Yturri,* 504 S.W.2d 809, 812 (Tex.Civ.App.—San Antonio 1973, no writ). Nor, in our view, does the established fact that Mr. Dahl's hostility probably will influence his decisions adversely to the beneficiaries authorize his removal as a trustee. Absent an evincing that his hostility triggers decisions or actions otherwise justifying his removal, and none is manifested here, his removal is not authorized under this record. *White v. White, supra,* at 1094.

In brief, to secure Mr. Dahl's removal as trustee, Mrs. Akin had the burden of proving removal grounds. *Penix v. First Nat. Bank of Paris,* 260 S.W.2d 63, 68 (Tex.Civ. App.—Texarkana 1953, writ ref'd). Under this record, she has not done so. Dahl's second point of error is sustained.

In its judgment, the court recited its finding that Mr. Dahl's special power of ap-

pointment contained in Mrs. Dahl's will is an adjunct of and inherent in said trust, and that the removal of Mr. Dahl as trustee should require the voiding of his power of appointment. The court then decreed that Mr. Dahl's power of appointment is voided.

By his third point, Mr. Dahl attacks the decree. His position is, in fine, that his power of appointment is independent and survives the termination of his trusteeship. The Akins, asserting that the power of appointment and position of trustee are subject to the same requirements of law and are governed by the same equitable principles, offer the same arguments advanced for Mr. Dahl's removal as trustee.

■ We have held that grounds for removal of Mr. Dahl as trustee have not been established. It logically follows that the court's voidance of Mr. Dahl's power of appointment on the basis of his removal as trustee cannot stand. *Compare Dickerson v. Keller,* 521 S.W.2d 288, 291–92 (Tex.Civ. App.—Texarkana 1975, writ ref'd n.r.e.). The third point is sustained.

Accordingly, the judgment of the trial court rendered in Cause No. 79–904–A is reversed. Judgment is here rendered that Mrs. Akin take nothing by her action to remove Mr. Dahl as trustee of the Lille E. Dahl Trust and to void his power of appointment under Mrs. Dahl's will.

### ON MOTIONS FOR REHEARING

All parties adversely affected by our respective judgments rendered in these three causes have filed motions for rehearing. After considering the motions, we are not persuaded to change our original judgments; however, we must write further on one matter.

In our cause No. 9341, the Akins' appeal from the monetary judgment rendered in favor of Mr. Dahl in cause No. 78–11230–L on the docket of the 193rd Judicial District Court, Mr. Dahl presented a cross-point by which he contended that the trial court erred in ordering the $1,450,000 remittitur and that the remitted amount should be restored on appeal. In overruling the cross-

point, we held that because Mr. Dahl did not preserve his cross-point contention in the trial court, we did not have jurisdiction to entertain it. In so holding, we erred, for we had overlooked the provision of Rule 328, Texas Rules of Civil Procedure, which specifies that when the party for whose benefit the remittitur is made shall appeal, then the party remitting shall not be barred from contending in the appellate court that said remittitur should not have been required in whole or in part. Conformable to the rule, we now consider the cross-point.

Mr. Dahl urges that in the light of the whole record, the remittitur ordered is manifestly unjust because the damages he suffered and the effect on his reputation were, in the words of a witness, "irreparable" and "staggering" for one of his stature. We previously reviewed these as well as all other aspects of the damages in considering, discussing, and overruling the Akins' contentions that the damages, even with the remittitur, are excessive, and those matters, although now reconsidered, will not be repeated here. We do reiterate, however, that we recognized the trial court authorized the total remittitur after determining, by the exercise of its sound judicial judgment and discretion, what amounts would be reasonable compensation for the injuries Mr. Dahl sustained under the evidence. *See Flanigan v. Carswell,* 159 Tex. 598, 324 S.W.2d 835, 840 (1959).

■ The question, then, is whether the trial court abused its discretion in effecting the remittitur. *Id.* After considering the remittitur in the light of the whole record, we are not able to say that the action of the court in effecting the remittitur was manifestly unjust and, therefore, we perceive no abuse of discretion by the trial court. The cross-point is overruled.

All motions for rehearing are overruled.